## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA, the STATES of
CALIFORNIA, COLORADO, CONNECTICUT,
FLORIDA, GEORGIA, ILLINOIS, INDIANA,
IOWA, LOUISIANA, MARYLAND, MICHIGAN,
MINNESOTA, MONTANA, NEVADA, NEW
JERSEY, NEW YORK, NORTH CAROLINA,
OKLAHOMA, TENNESSEE, TEXAS,
WASHINGTON, WISCONSIN, and the
COMMONWEALTH of VIRGINIA, *ex rel.*
JOHN/JANE DOE,

Civil Action No.

JURY TRIAL DEMANDED

**FILED IN CAMERA AND UNDER
SEAL PURSUANT TO 31 U.S.C.
§ 3730**

Plaintiffs,

v.

DAVITA, INC., AKA DAVITA HEALTHCARE
PARTNERS, INC.,

Defendant.

## COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

### I.   INTRODUCTION

1.   This is an action to recover damages, civil penalties, and other relief on behalf of
the United States and certain States (the "States" or "*Qui Tam* States") arising from false and/or
fraudulent statements, records, and claims made and caused to be made by the Defendant
DaVita, Inc. aka DaVita Healthcare Partners, Inc. ("DaVita" or "Defendant") and/or its agents
and employees and subsidiaries to Government Health Care Programs, as well as failure to return
overpayments, all in violation of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as
amended by the Fraud Enforcement and Recovery Act of 2009 and the Patient Protection and
Affordable Care Act of 2010 ("the FCA" or "the Act"), and the State False Claims Act statutes
identified herein ("State *Qui Tam* statutes" or "State FCAs").

2.    This health care fraud has been and continues to be committed on an ongoing basis by DaVita. DaVita's fraudulent schemes include inducing physicians to refer, recommend and otherwise influence patients to seek services at renal dialysis centers that DaVita owns or in which DaVita has an ownership interest, by: (a) rewarding physicians monetarily with above-fair market value purchases of such physicians' dialysis centers and other illegal remuneration; (b) offering above fair-market terms and other illegal remuneration for joint ventures with such physicians to run dialysis centers; and (c) manipulating the valuations of target dialysis centers to create the appearance that such deals are fair market value when they were and are not. Further, as part of this fraudulent scheme, DaVita has been and is continuing to hide such manipulations and remuneration from the Independent Monitor appointed pursuant to DaVita's Corporate Integrity Agreement ("CIA") with the U.S. Department of Health and Human Services ("HHS") pursuant to a 2014 False Claims Act settlement between DaVita and the United States.

3.    This fraudulent conduct is made all the more egregious considering that DaVita is a repeat offender, having reached a settlement of some $400 million with the U. S. Government and several States in October 2014 relating to violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b (b) ("AKS") and the FCA in joint ventures with physicians (the "2014 Settlement"). The settlement covered conduct from March 1, 2005 to February 1, 2014 pertaining to joint ventures in which DaVita offered physicians above-fair-market value terms and manipulated deal valuations to justify the deals internally. While that misconduct is similar in part to the misconduct alleged in this Complaint, it is not identical in nature or scope. In particular, conduct violating the AKS and FCA alleged here and not released by the settlement has occurred and continues to occur in: (a) acquisitions (as opposed to joint ventures) and buy-outs (in which DaVita buys out a physician group's stake in a joint venture, acquiring 100% ownership) from

March 1, 2005 to the present; and (b) joint ventures from February 1, 2014 to the present. After its settlement, DaVita not only continued to engage in fraudulent conduct violating the AKS and FCA, DaVita violated the CIA it was placed under by the HHS to regulate its future conduct and has intentionally misled the Monitor put in place by the CIA.

4.      DaVita's conduct alleged herein violates the federal and State False Claims Acts. The federal False Claims Act ("FCA") was originally enacted during the Civil War to deal with unscrupulous military contractors. Congress substantially amended the FCA in 1986—and, again, in 2009 and 2010—to enhance the ability of the Government to recover losses sustained as a result of fraud against it. Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

5.      The FCA prohibits, *inter alia*: knowingly presenting (or causing to be presented) a false or fraudulent claim for payment or approval; knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; and, knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, and knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government. 31 U.S.C. §§ 3729(a)(1)(A), (B), (G). Any person who violates the FCA is liable for a civil penalty of up to \$21,916 for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a)(1); Civil Monetary Penalties Inflation Adjustment for 2017, 82 Fed. Reg. 9131, 9133, *available at*

-3-

https://www.federalregister.gov/documents/2017/02/03/2017-01306/civil-monetary-penalties-inflation-adjustment-for-2017.

6.     For purposes of the FCA, a person "knows" a claim is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). The FCA does not require proof that the defendant specifically intended to commit fraud. *Id.* Unless otherwise indicated, whenever the words "know," "learn," "discover" or similar words indicating knowledge are used in this Complaint, they mean "knowingly" as defined in the FCA.

7.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery. The FCA requires that the Complaint be filed under seal (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit. The person bringing the action is known under the FCA as the "Relator."

8.     Based on the foregoing federal FCA provisions and comparable provisions of the State FCAs, *qui tam* Plaintiff-Relator seeks, through this action, to recover damages and civil penalties arising from the Defendant's knowing fraud against the United States and the States including through the Medicare and Medicaid programs. DaVita has submitted and continues to submit to Government Health Care programs including Medicare and Medicaid, claims for treatment of dialysis patients which are tainted by its violations of the AKS and thus false or fraudulent claims under the FCA. This tainted revenue stream continues for years after a tainted acquisition or joint venture. Defendant has defrauded the Government of an estimated tens of

millions of dollars through its fraudulent acquisitions of physician owned dialysis centers as far back as 2005 and joint ventures since February 1, 2014.

9. The allegations set forth in this Complaint have not been publicly disclosed within the meaning of the FCA, as amended, 31 U.S.C. § 3730(e)(4), or analogous provisions of the State FCAs. In the alternative, if the Court finds that there was a public disclosure of such allegations before the filing of this Complaint, Relator is an "original source" as that term is used in the federal and State FCAs. *Id.*

## II. JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. § 3732, which confers jurisdiction over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. This Court has original and supplemental jurisdiction over the State law claims pursuant to 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367 because this action is brought under State laws for the recovery of funds paid by the *Qui Tam* States, and arises from the same transaction or occurrence as the claims brought on behalf of the United States under 31 U.S.C. § 3730.

11. This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant can be found in and transacts substantial business in this district, including business related to Defendant's misconduct.

12. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1391, and 28 U.S.C. § 1395(a), because Defendant transacts business in this District by, among other things, operating dialysis centers and negotiating deals to acquire, jointly invest in or divest from such centers, including business related to Defendant's misconduct.

## III. PARTIES

13. Plaintiffs the United States of America and the *Qui Tam* States are the real parties in interest with respect to the federal and state False Claims Act *qui tam* claims herein. At this

-5-

time, Plaintiff-Relator John/Jane Doe is pursuing causes of action on behalf of the named Plaintiffs the United States and the States on the FCA *qui tam* claims set forth herein pursuant to 31 U.S.C. § 3730(b) and comparable provisions of the State FCAs.

14.     Relator John/Jane Doe is a citizen of the United States who is familiar with and has knowledge of the Defendant's business operations and the allegations herein. Relator's identity and additional information regarding Relator's knowledge of DaVita's fraudulent schemes are being provided to the United States and the States in disclosure documents served upon the United States and the States pursuant to the federal and state FCAs.

15.     Defendant DaVita is a Delaware corporation with its principal place of business in Denver, Colorado. Prior to September 2016, DaVita went by the name DaVita HealthCare Partners, Inc. DaVita provides dialysis and related services for patients suffering from chronic kidney failure or end stage renal disease ("ESRD"). According to DaVita's Securities and Exchange Commission Form 10-K for the year ended December 31, 2016, DaVita provided "dialysis and administrative services in the U.S. through a network of 2,350 outpatient dialysis centers in 46 states and the District of Columbia, serving a total of approximately 187,700 patients" with 60% of its revenue coming from the Medicare and Medicaid programs. *See* DaVita, Inc., Annual Report (Form 10-K), 2, 5 (Feb. 24, 2017). As noted above, in October 2014, DaVita reached a settlement of some $400 million with the United States and several states over claims DaVita had induced physicians to refer business to DaVita's ESRD centers through joint ventures in violation of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b (b), and state and federal FCAs.

-6-

## IV.    APPLICABLE FEDERAL AND STATE LAWS AND REGULATIONS

### A.    Government Health Insurance Programs

16.    The Health Insurance for the Aged and Disabled Program, known as Medicare, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* ("Medicare"), is a health insurance program administered by the United States Government, funded by taxpayer revenue. HHS oversees Medicare through its Centers for Medicare and Medicaid Services ("CMS").

17.    Medicare was designed to be a health insurance program and to provide for payment of, among other things, medical services and equipment to persons over 65 years of age and certain others who qualify under Medicare's terms and conditions, including patients with ESRD who qualify regardless of age. The Medicare program has four parts: Part A, Part B, Part C, and Part D.  Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care. *See* 42 U.S.C. §§ 1395c-1395i-4. Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, including ESRD centers, to Medicare patients. *See* 42 U.S.C. §§ 1395k, 1395l, 1395x(s), 1395rr (providing for services to ESRD patients). Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

18.    The Medicaid program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v ("Medicaid"), is a health insurance program administered by the United States Government and the States and is funded jointly by state and federal taxpayer revenue. CMS and HHS oversee Medicaid jointly with agencies in each State. Each named Plaintiff State participates in Medicaid.

19.    Medicaid is designed to assist participating States in providing medical services, medical equipment, and prescription drugs to needy individuals. The States and the United States

-7-

share reimbursement costs. States directly pay providers, and then obtain the federal contribution from accounts drawn on the United States Treasury. 42 C.F.R. §§ 430.0-*et seq*. Federal funding for the Medicaid Program includes support for Medicare Savings Programs which help qualifying Medicare beneficiaries pay Part A and B premiums, co-payments, co-insurance, and deductibles. The Medicare Savings Programs consist of the Qualified Medicare Beneficiary Program, 42 U.S.C. § 1396d(p)(1), the Specified Low-Income Medicare Beneficiary Program, 42 U.S.C. § 1396a(a)(10)(E)(iii), the Qualifying Individual Program, 42 U.S.C. § 1396a(a)(10)(E)(iv), and the Qualified Disabled and Working Individuals Program, 42 U.S.C. § 1396d(s). Medicaid may serve as the primary insurer, or in some instances as the secondary insurer (e.g., with Medicare or private insurance providing primary coverage).

20.     The Civilian Health and Medical Program of the Uniformed Services (now known as "TRICARE"), 10 U.S.C. §§ 1071-1106, provides benefits for health care services furnished by civilian providers, physicians, and suppliers to members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members. TRICARE pays for, among other things, ESRD services for its beneficiaries. CHAMPVA, administered by the United States Department of Veterans Affairs ("VA"), is a health care program for the families of veterans with 100-percent service-connected disability, or for those who died from a VA-rated-service-connected disability.

21.     The Federal Employee Health Benefits Program ("FEHBP") provides healthcare benefits for qualified federal employees and their dependents. It pays for, among other things, ESRD services for its beneficiaries. Under the FEHBP, the federal employee is covered by private payor health insurance which is in turn subsidized in part by the federal government. As a

result, fraud on a patient covered by the FEHBP constitutes fraud on the federal government and the loss of federal funds.

22.    The federal government operates hospitals, including through its Departments of Defense and VA, and receives and uses federal funds to provide medication to patients treated at these facilities and otherwise, as well as outpatient services. A network of already established VA hospitals and services make up the VA health care system.

23.    Together, the programs described above, and any other government-funded health care programs, are referred to as "Government Health Care Programs."

24.    Institutional health care providers such as dialysis centers enter into Provider Agreements with CMS in order to establish their eligibility to seek Medicare reimbursements. As part of those agreements, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A, at 48 (for institutional providers including ESRD facilities). The States have similar agreements for their Medicaid programs. *See, e.g.*, State of New Jersey Provider Application (FD-20); *New York v. Amgen, Inc.*, 652 F.3d 103, 112-114 (finding that kickbacks violate Medicaid conditions of payment in, *inter alia*, New York, California and Illinois).

25.    Claims for payment presented by health care providers to Government Health Care Programs contain similar representations and certifications. *See, e.g.*, Form 1450 (UB04) (institutional provider paper claim form for Medicare and Medicaid); 837I (electronic version of Form 1450).

26.     When submitting a claim for payment, a provider does so subject to and under the terms of its certification to the United States that the services were delivered in accordance with federal law, including, for example, Government Health Care Program laws and regulations. Similar State Medicaid certifications also incorporate relevant state laws and regulations. Government Health Care Programs require compliance with these certifications as a material condition of payment, and claims that violate these certifications are false or fraudulent claims under the False Claims Act. CMS, its fiscal agents, and relevant State health agencies will not pay claims for claims for services provided in violation of relevant state or federal laws, including the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

**B.      The Federal and State False Claims Acts**

27.     The Federal FCA creates liability for "any person who," among other things:

    a.   "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

    b.   "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

    c.   "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

28.     The FCA further provides that any person who violates the FCA "is liable to the United States for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C.

§ 3729(a)(1). The penalties were revised following the Bipartisan Budget Act of 2015, Public Law 114-74 (Nov. 2, 2015). *See* Civil Monetary Penalties Inflation Adjustment for 2017, 82 Fed. Reg. 9131, 9133, *available at* https://www.federalregister.gov/documents/2017/02/03/2017-01306/civil-monetary-penalties-inflation-adjustment-for-2017. As such, civil monetary penalties are now at a maximum of $21,916 for claims whose associated violations occurred after November 2, 2015 but for which penalties were assessed after February 3, 2017. *See id.*

29.    The FCA provides that "the terms 'knowing' and 'knowingly' – (A) mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1).

30.    The FCA provides that "the term 'claim' – (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that— (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government— (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

31.    The FCA provides that "the term 'obligation' means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the

retention of any overpayment[.]" 31 U.S.C. § 3729(b)(3). Moreover, in the health care context,

such as Medicare and Medicaid, an obligation is defined as any "overpayment retained by a

person after the deadline for reporting and returning the overpayment" and an overpayment must

be reported "by the later of...60 days after the date on which the overpayment was identified...or

the date any corresponding cost report is due, if applicable." Patient Protection and Affordable

Care Act, March 23, 2010 ("PPACA"), Pub. L. 111-148 (Mar. 23, 2010), Section 6404(a),

codified at 42 U.S.C. § 1128J(d); *see also* 42 U.S.C. § 1320a-7k(d) (describing the obligation to

report overpayments within 60 days).

32.     The FCA provides that "the term 'material' means having a natural tendency to

influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C.

§ 3729(b)(4).

33.     Additionally, many states have passed False Claims Act laws, which in most

instances closely track the federal FCA. The State FCAs apply, *inter alia*, to the state portion of

Medicaid losses caused by false or fraudulent Medicaid claims to the jointly federal-state funded

Medicaid program and failure to report and return any overpayments therefrom. The Defendant's

acts alleged herein also constitute violations of the California False Claims Act, Cal. Gov't. Code

§§ 12650 *et seq.*; the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5 *et

seq.*; the Connecticut False Claims Act, Conn. Gen. Stat. §§ 4-274, *et seq.*; the Florida False

Claims Act, Fla. Stat. §§ 68.081, *et seq.*; the Georgia Medicaid False Claims Act, Ga. Code.

Ann. §§ 49-4-168, *et seq.*; the Illinois False Claims Act, 740 Ill. Comp. Stat. §§ 175/1, *et seq.*;

the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.7, *et

seq.*; the Iowa False Claims Act, Iowa Code §§ 685.1 *et seq.*; the Louisiana Medical Assistance

Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:437.1 *et seq.*; the Maryland False Health

Claims Act, Md. Code Ann. Health-Gen §§ 2-601 *et seq.*; the Michigan Medicaid False Claims

Act, Stat. Mich. Comp. Laws Serv. §§ 400.601 *et seq.*; the Minnesota False Claims Act, Minn.

Stat. §§ 15C.01 *et seq.*; the Montana False Claims Act, Mont. Code Ann. §§ 17-8-401 *et seq.*; the

Nevada Submission of False Claims to State and Local Government Act, Nev. Rev. Stat.

§§ 357.010, *et seq.*; the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1, *et seq.*; the

New York False Claims Act, N.Y State Fin. Law §§ 187, *et seq.*; the North Carolina False

Claims Act, N.C. Gen. Stat. §§ 1-605 *et seq.*; the Oklahoma Medicaid False Claims Act, Okla.

Stat. tit. 63, §§ 5053 *et seq.*; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-

5-181, *et seq.*; the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.001, *et*

*seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1, *et seq.*; the

Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code §§ 74.66.005 *et seq.*; and

the Wisconsin False Claims For Medical Assistance Act, Wis. Stat. Ann. §§ 20.931, *et seq.*

(repealed non-retroactively effective July 14, 2015). Each of the statutes listed above contains

*qui tam* provisions governing, *inter alia*, a relator's right to claim a share of the State's recovery.

## C.     The Anti-Kickback Laws of the United States and the *Qui Tam* States

34.     The Medicare and Medicaid Fraud and Abuse Statute (the "Anti-Kickback

Statute" or "AKS"), 42 U.S.C. § 1320a-7b(b), was first enacted under the Social Security Act in

1972 and has been amended many times since. The AKS arose out of Congressional concern

that payoffs to physicians corrupt medical decision-making and result in the supply of goods and

services that are medically inappropriate, unduly costly, medically unnecessary, of poor quality,

or even harmful to a vulnerable patient population. To protect the integrity of Government

Health Care Programs from these difficult-to-detect harms, Congress enacted a prohibition

against the payment of kickbacks in any form, regardless of whether a particular kickback

actually gives rise to overutilization or poor quality of care.

35.     The AKS prohibits any person or entity from offering or paying or soliciting or

receiving "any remuneration" to induce or reward any person for referring, recommending, or

arranging for health care services or items for which payment may be made under a federally-

funded health care program.  42 U.S.C. § 1320a-7b(b).  The statute's prohibition applies to both

sides of an impermissible kickback relationship (i.e., the giver and the recipient of the kickback),

and provides, in pertinent part:

    **(b) Illegal remunerations . . .**

    **(2) Whoever knowingly and willfully offers or pays any remuneration (including
    any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or
    in kind to any person to induce such person –**

        **a.      To refer an individual to a person for the furnishing or arranging
        for the furnishing of any item or service for which payment may be made
        in whole or in part under Federal health care program, or**

        **b.   ·   To purchase, lease, order or arrange for or recommend purchasing,
        leasing or ordering any good, facility, service, or item for which payment
        may be made in whole or in part under a Federal health care program,**

    **Shall be guilty of a felony and upon conviction thereof, shall be fined not more
    than $25,000 or imprisoned for not more than five years, or both.**

42 U.S.C. § 1320a-7b(b). The AKS further defines "remuneration" to include "transfers of items

or services for free or for other than fair market value." 42 U.S.C. § 1320a-7a(i)(6).

36.     Underscoring the breadth of the statutory definition of "remuneration," the HHS

Office of Inspector General ("HHS OIG" or "OIG") has defined the term "remuneration" as

"anything of value in any form or manner whatsoever." HHS OIG, *OIG Anti-Kickback*

*Provisions*, 56 Fed. Reg. 35952, 35958 (1991). *See also United States ex rel. Fry v. The Health*

*Alliance of Greater Cincinnati*, 2008 WL 5282139, at \*7 (S.D. Ohio Dec. 18, 2008) (citing to

"anything of value" language in the HHS OIG Anti-Kickback Provisions); *United States v.*

-14-

*Shaw*, 106 F. Supp. 2d 103, 114 (D. Mass. 2000) (quoting language in the HHS OIG Anti-Kickback Provisions saying that "Congress's intent in placing the term 'remuneration' in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever . . . Moreover [. . .] Congress prohibited transactions where there is no direct payment at all from the party receiving referrals"); HHS OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 66 Fed. Reg. 23731, 23734 (May 5, 2003) (asserting that the Anti-Kickback Statute addresses the offer or payment of "anything of value").

37.     Compliance with the AKS is a precondition to participation and to payment as a health care provider under Medicare and Medicaid. *See generally United States ex rel. Wilkins v. United Health Group, Inc.,* 659 F.3d 295 (3d Cir. 2011) (Medicare); *United States ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377 (1st Cir. 2011) (Medicare); *State of New York v. Amgen Inc.*, 652 F.3d 103 (1st Cir. 2011) (Medicaid); *United States ex rel. Westmoreland v. Amgen Inc.*, 812 F. Supp. 2d 39, 53-54 (D. Mass. 2011) ("If providers could demand payment for claims resulting from kickback violations, then the Anti–Kickback Statute would be meaningless legislation."). The PPACA, *supra,* amended the AKS to make clear that violations of the AKS can subject the perpetrator to liability under the federal FCA and to clarify that no actual knowledge of the section or specific intent to commit a violation of the section is required. 42 U.S.C. §1320a-7b (g), (h). Accordingly, the PPACA chimes with case law finding that claims for payment for services that result from kickbacks are false or fraudulent under the FCA.

38.     Violation of the AKS subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation. 42 U.S.C. § 1320a-7(b)(7), 1320a-7a(a)(7).

39.    Many of the named Plaintiff States also have anti-kickback laws similar to the

AKS, which apply to medical providers and entities participating in their Medicaid programs.

*See, e.g.,* California, Cal. Welf. & Inst. Code § 14107.2; Florida, Fla. Stat. Ann. §

409.920(2)(a)(5); Illinois, 305 Ill. Comp. Stat. Ann. 5/8A-3; Louisiana, La. Rev. Stat. Ann. §

46:438.2; Michigan, Mich. Comp. Laws Ann. § 400.604; New York, N.Y. Soc. Serv. Law § 366-

d; and Virginia, Va. Code Ann. § 32.1-315.

### *1.    The Safe Harbors of the Anti-Kickback Statute*

40.    The AKS contains exceptions, or safe harbors, listed at 42 U.S.C. § 1320a-

7(b)(3), that exempt certain transactions from its prohibitions. Once the Government has

demonstrated a violation of the AKS, the burden shifts to the defendant to establish that

defendant's conduct at issue was protected by such a safe harbor.

41.    Accordingly, while Relator alleges that Defendant's alleged conduct here does not

fit within a safe harbor, Plaintiffs need not prove this as part of their affirmative case. *United

States v. Rogan*, 459 F. Supp. 2d 692, 716 (N. D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008).

Conduct must fit squarely within a safe harbor in order to qualify for protection.

42.    There is a safe harbor for "Sale of Practice" by a practitioner to a "hospital or

other entity." 42 C.F.R. § 1001.952(e). The "Sale of Practice" safe harbor requires, however, that

the "practitioner who is selling his or her practice will not be in a professional position after

completion of the sale to make or influence referrals to, or otherwise generate business for, the

purchasing hospital or entity for which payment may be made under Medicare, Medicaid or

other Federal health care programs." 42 C.F.R. § 1001.952(e). Thus if a physician selling a

practice remained involved with the operation as a Medical Director, the "Sale of Practice" safe

harbor would not apply. *See id.*

43.     There is also a safe harbor for "Personal Services and Management Contracts." 42 C.F.R. § 1001.952(d). The "Personal Services and Management Contracts" safe harbor requires, *inter alia*, that the "aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs." *Id.*

44.     The "Personal Services and Management Contracts" safe harbor also requires that, if an arrangement is for periods of part-time work, a written agreement must specify "exactly the schedule of such intervals, their precise length, and the exact charge for such intervals." Thus, if the directorship of a center providing medical services is negotiated in a non-arms-length transaction, with an expectation of future referrals, the safe harbor does not apply.

45.     There is a safe harbor for "space rental," which requires, *inter alia*, that the "aggregate rental charge is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under **Medicare, Medicaid** or other Federal health care programs. 42 C.F.R. § 1001.952 (b). Thus, when leases are negotiated in non-arms-length fashion with a physician and with an expectation of future referral business from that physician, the "space rental" safe harbor does not apply.

46.     There is a safe harbor for "investment interests," relevant to joint ventures. 42 C.F.R. § 1001.952(a). Again this requires that the "terms on which an investment interest is offered to an investor who is in a position to make or influence referrals to, furnish items or

services to, or otherwise generate business for the entity must not be related to the previous or expected volume of referrals, items or services furnished, or the amount of business otherwise generated from that investor to the entity[.]" 42 C.F.R. § 1001.952(a)(2)(iii). Thus when joint venture returns are negotiated in non-arms-length fashion with a physician partner in an expectation of inducing referrals from the joint venture physician partner to the business, the "investment interests" safe harbor does not apply.

### *2.     HHS OIG Guidance on Deal Valuation Methodology*

47.     Under 42 U.S.C. § 1320a-7d(b), the HHS OIG provides guidance to health care providers on whether proposed financial arrangements are at risk of violating the AKS. In multiple advisory opinions, the OIG has stated that a financial arrangement violates the AKS if "one purpose of the remuneration is to obtain money for the referral of services or to induce further referrals." *See, e.g.*, OIG Advisory Opinion No. 97-5, 4 (Oct 6, 1997) *available at* http://oig.hhs.gov/fraud/docs/advisoryopinions/1997/ao97_5.pdf (citing *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989) and *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985), *cert. denied*, 476 U.S. 988 (1985))(emphasis in original). Even where there is more than one purpose of the remuneration, if one of them is to obtain money from referrals, the statute is violated. *Greber*, 760 F.2d at 72 ("If the payments were intended to induce the physician to use Cardio-Med's services, the statute was violated, even if the payments were also intended to compensate for professional services."); *see also United States v. Bay State Ambulance and Hospital Rental Service, Inc.*, 874 F.2d 20, 30 (1st Cir. 1989).

48.     In the health care field, a transaction's "fair market value" is a key concept, the application of which determines whether or not a given payment to a referring physician constitutes improper, non-arms-length remuneration and whether or not a safe harbor applies. *See* 42 U.S.C. § 1320a-7a(i)(6) (defining "remuneration" under the AKS as "transfers of items or

services for free or for other than fair market value."); 42 C.F.R. § 1001.952(d) (requiring that agreements to provide services be "fair market value in arms-length transactions" in order to qualify for the "personal management services" safe harbor); 42 C.F.R. § 1001.952(b) (requiring that leases be at "fair market value in arms-length transactions" in order to qualify for "space rental" safe harbor).

49.     In assessing fair market value, the OIG has warned that "payments for 'intangibles' can easily be used to disguise payments for referrals of federal health care program business, and therefore we are unwilling to provide safe harbor protection for any particular valuation methodology." 64 Fed. Reg. 63,518, 63,550 (Nov. 19, 1999) *available at* https://oig.hhs.gov/fraud/docs/safeharborregulations/getdoc1.pdf.

50.     In a 1992 letter, OIG warned that traditional and normally acceptable business valuation methods may violate the AKS and that intangibles such as goodwill and value of an ongoing business were particularly suspect, whenever there is going to be a "continuing relationship" between seller and buyer. Letter to T. J. Sullivan, Health Care Industries, from D. McCarty Thornton, Inspector General Division (Dec. 22, 1992), *available at* https://oig.hhs.gov/fraud/docs/safeharborregulations/acquisition122292.htm.

51.     The guidance in that letter was clarified in a subsequent OIG letter to the American Hospital Association in 1993 explaining that payments for intangible assets were not illegal *per se*, but, "any such payments are subject to scrutiny to determine whether they violate the anti-kickback statute. The fact that the parties may identify the purpose of the payment as something other than a payment for referrals is not determinative." The letter explains that the "[t]he intent of the parties is the critical element in the determination of a violation under the anti-kickback statute, . . . Consequently, each particular situation must be judged on its own

merits and based on its own facts and circumstances." Letter to John E. Steiner, American

Hospital Association, from D. McCarty Thornton, Inspector General Division (Nov. 2, 1993),

*available at* https://oig.hhs.gov/fraud/docs/safeharborregulations/acquisition110293.htm.

52.    The OIG's view has not significantly changed since. A 2009 OIG/HHS advisory

opinion approving an arrangement based on tangible assets, warned that had the valuation been

based on cash flow or intangibles, it might be more suspect because "a cash flow-based valuation

of that business potentially would include the value of" referrals. OIG Advisory Opinion No. 09-

09 (July 22, 2009) *available at*

https://oig.hhs.gov/fraud/docs/advisoryopinions/2009/AdvOpn09-09.pdf.

53.    Accordingly, a methodology for valuing deals that uses revenue earns heightened

scrutiny, particularly in the context of an ongoing relationship between seller and buyer. Models

of cash flow could be a cover for payment for referrals and the government looks at "all the facts

and circumstances." The final test is the intent of the parties, not the method used. As such, any

evidence that valuations or other transaction terms were intentionally manipulated by a health

care provider is highly relevant to the analysis of whether the AKS has been violated.

## V.    FACTS AND ALLEGATIONS

### A.    Summary of Defendant's Unlawful Conduct

54.    Patients with end stage renal disease ("ESRD") have advanced kidney impairment

and require either a kidney transplant or dialysis treatments about three times a week in order to

stay alive. Dialysis is an artificial method of removing salt, toxins and fluids from the blood,

which can be offered by specialist ESRD/dialysis centers to which a patient travels for service,

usually located close to the patients' home.

55.    The Medicare ESRD program has provided coverage for dialysis and related

services for ESRD patients since 1972 regardless of age or financial circumstances. Congress

sets the rates of reimbursement for dialysis (and related) treatments under Medicare. Medicaid,

TRICARE, other Government-funded health care programs such as Medicaid, and private

insurers also cover dialysis, either separately or alongside Medicare coverage.

56.     DaVita's business depends on its relationship with physicians who refer patients

to its dialysis centers. DaVita explained this in its most recent Form 10-K, filed with the

Securities and Exchange Commission:

> **If a significant number of physicians were to cease referring patients to our dialysis centers, whether due to regulatory or other reasons, it would have a material adverse effect on our revenues, earnings and cash flows.**
>
> We believe that physicians prefer to have their patients treated at dialysis centers where they or other members of their practice supervise the overall care provided as medical director of the center. As a result, the primary referral source for most of our centers is often the physician or physician group providing medical director services to the center.

DaVita, Inc., Annual Report (Form 10-K), 44 (Feb. 24, 2017) (emphasis in original).

57.     Rather than generating business by developing superior services and patient care,

DaVita knowingly uses illegal kickbacks to physicians to secure a steady flow of referrals.

DaVita routinely acquires physicians' ERSD dialysis centers, in whole or in part (for example,

by buying out physicians' ownership interest in a joint venture to produce 100% DaVita

ownership), for prices well above fair-market value. The selling or jointly contracting

physician(s) become Medical Directors of the acquired dialysis center(s) and are induced to and

tacitly agree to refer patients to DaVita.

58.     DaVita offers Medical Directorships for five or ten year terms (with the

possibility of renewal) in order to illegally compensate Medical Directors for their referrals and

secure the stream of referrals for an extended period.

59.     Likewise, DaVita includes non-compete agreements and restrictive covenants as part of its Medical Director agreements to further protect the purchased stream of referrals. These "non-compete" clauses typically cover not only the Medical Director or selling physician but also their fellow physicians, employees and associates in any physician group practice they belong to.

60.     In its Form 10-K for the year ended December 31, 2016, DaVita admitted that its part-time Medical Directorships do not satisfy the requirement of the Personal Service and Management Contracts Safe Harbor, 42 C.F.R. § 1001.952 (d), because the Medical Director agreements do not "specify the schedule of intervals of services, and their precise length and the exact charge for such services." DaVita further admitted that "these arrangements could be subject to scrutiny since they do not expressly describe the schedule of part-time services to be provided under the arrangement." *Id.* at 10.

61.     DaVita's growth and expansion strategy includes approaching physician-owners of dialysis centers about possible acquisitions or joint ventures. The physicians are well-aware that they are acquisition targets and usually have a sale price in mind. This price generally reflects the volume of patients referred to the center. The target center provides DaVita with preliminary information regarding the size and insurance of its patient population. DaVita projects the revenue the center would produce with DaVita's negotiated reimbursement rates (*i.e.* assuming DaVita will capture all referrals). Based on that projection, DaVita makes a preliminary offer, and if the physician is interested, DaVita binds the physician(s) with a letter of intent. DaVita then obtains more detailed data from the physician-owners in due diligence. This new data often reflects lower revenue and higher expenses than the preliminary information. This should result in a lower valuation and offer price, but to avoid disappointing the physician-

owner, DaVita manipulates other elements of the models, as explained below, to arrive back at the same valuation. DaVita transmits these doctored financial projections to a third-party appraiser who "independently" arrives at DaVita's desired valuation because DaVita manipulated the inputs. DaVita then sends only selected deal documents including the independent appraisal and broker opinions of value to its CIA Independent Monitor for approval. If risk is rated low, the deal closes soon after.

62.    DaVita's schemes to purchase physician referrals include, but are not limited to:

a.  providing excessive compensation for Medical Directorships;

b.  offering physicians excessive prices and terms for their dialysis centers;

c.  agreeing to pay excessive rent over the broker opinion of value and obscuring such payments in an increased purchase price;

d.  binding physicians and physicians' employees and associates with non-compete agreements and restrictive covenants for an extensive time period.

e.  in joint ventures, charging physicians low non-fair-market value management fees;

f.  offering physicians promises of future joint venture opportunities and medical directorships; and

g.  in joint ventures, offering to jointly finance with physicians to allow physicians to obtain more favorable financing terms for their portion of the investment than they otherwise could obtain.

63.    The schemes delineated above constitute inducements and remuneration in violation of the AKS, making DaVita's certifications' of AKS compliance in its Medicaid and Medicare provider agreements and in its claims for payment false and fraudulent under the FCA.

64.     The non-competes that form an integral part of any DaVita acquisition or joint venture provide evidence of DaVita's intent to capture referral business from its Medical Directors and partners in their physician practice.

65.     DaVita's schemes rely on its ability to manipulate the revenue and expense models to create falsely inflated "fair market values" for its center acquisitions. This inflated valuation hides illegal remuneration for referrals. In the past (prior to the 2014 Settlement), DaVita went so far as to add fictitious patients to its valuation models in order to support desired deal valuations. Today DaVita is more subtle but no less intentional in its fraudulent conduct. Its manipulations of its valuation models include but are not limited to:

a.   manipulating the revenue per treatment in valuation models to reverse-engineer the desired deal valuation;

b.   manipulating the number of missed treatments or treatment growth rates in valuation models;

c.   manipulating patient population or insurance mix to artificially inflate valuation models;

d.   manipulating investment risk profiles in valuation models to compensate for the cost of necessary capital improvements;

e.   omitting necessary capital improvements from expense models; and

f.   omitting necessary renovations or mold remediation from valuation models.

66.     The practice of manipulating revenue per treatment to reverse-engineer the desired deal valuation is known at DaVita as "plugging." To give a hypothetical example, suppose due diligence turns up information that will cause the valuation to fall short of the level specified in the Letter of Intent and desired by the physician by $3 million. Suppose further that

the number of patient treatments at a center per year is projected to be 20,000 at the rate of referrals that DaVita expects. Then DaVita will add $15 to the revenue per treatment or RPT, a measure that captures how much revenue DaVita expects to make each time a patient comes in for dialysis. When entered into the valuation model, this increase of $15 in RPT will give an expected increase in revenue of $300,000. As the model will multiply the expected annual revenue by 10 to give the total deal valuation, this manipulation will result in an increase of $3 million in deal valuation, as required by DaVita to justify the remuneration that the physician is counting on and that is in the Letter of Intent.

67.    Other quantities, such as the number of missed treatments or treatment growth rates or patient population mix, are similarly reverse-engineered by DaVita in order to support the deal price in the Letter of Intent.

68.    All the manipulations delineated above result in non-fair-market-value transactions, amounting to violations of the AKS and making subsequent Medicaid and Medicare claims for payment false or fraudulent under the FCA.

69.    These manipulations are designed to evade the review of Government Health Programs and the Independent Monitor and accordingly serve as evidence that DaVita knows its schemes are improper.

70.    This wrongdoing is similar, but not identical, to conduct that was the subject of the 2014 Settlement, serving as further evidence that DaVita knows its schemes are improper. The 2014 Settlement covered DaVita's inducement of physicians to refer to DaVita dialysis centers through transactions resulting in the formation of joint ventures, in which DaVita paid physicians above fair market value for shares in dialysis centers, and sold physicians shares in dialysis centers at below fair market value, while manipulating the valuation of deals through ad-

hoc methods and illogical formulas to make physician remuneration appear to be at fair market value when it was not.

71.     These manipulations serve to hide the illegal remuneration paid to physicians from the Independent Monitor appointed under DaVita's CIA with the United States Department of Health and Human Services, implemented as part of the 2014 Settlement. (See discussion below on the CIA for more detail on the Independent Monitor's role).

72.     DaVita routinely provides the Monitor with a set of financial records tailored to support deal amounts, while secretly utilizing internal valuations of the fair market value of the deal. These internal valuations establish that DaVita regularly pays above fair market value for these acquisitions in order to illegally remunerate physicians for their referrals.

73.     DaVita Group Vice-President David Finn, who has worked at DaVita since 2003 and exercises control over all acquisitions and joint ventures nationally, and others in DaVita management, strive to pay whatever physicians want to get the deal done and secure future referrals. "Patient census," the total number of patients acquired through deals with physicians, is a critical metric to management. Management is aware that purchasing referrals runs afoul of the AKS and the CIA.

74.     As noted above, AKS violations are material to government payment decisions. Claimants certify AKS compliance when they make payment claims, demonstrating that AKS compliance has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4) (defining "material" in the FCA).

75.     Through DaVita's schemes, which are detailed further in disclosures to the government, DaVita has defrauded the United States and the State Plaintiffs of tens of millions of dollars and the fraud is ongoing. In the process, DaVita has greatly enriched itself.

## B.    Specific Examples of DaVita Deals

76.    DaVita has engaged in many acquisitions involving the manipulation of revenue and other fraudulent schemes as described above, including, but not limited to, the following (a more comprehensive list is being provided to the Government as part of Relator's mandatory disclosures):

| Deal Name | Date Closed | Location | Deal Value (if known) |
|---|---|---|---|
| Good Samaritan | 07/2005 | IN/IL | $9,000,000 |
| Royce Lin & Bay Area PD | 10/2005 | WI | $8,475,000 |
| Las Vegas Summerlin | 06/2006 | NV | $7,680,000 |
| FMC Concord | 06/2006 | NC | $700,000 |
| Leesburg | 07/2007 | FL | $3,000,000 |
| Payton | 9/30/2008 | OH | $28,275,000 |
| Caucus | 12/1/2008 | IA | $14,000,000 |
| Muskogee (JV Buyout of 38.5%) | 3/1/2009 | OK | $1,424,500 |
| Renal Care Corporation | 8/1/2009 | OR | $13,300,000 |
| Wheaton | 3/1/2010 | IA | $1,000,000 |
| Canton Acutes | 1/1/2010 | OH | $70,000 |
| Hackensack | 12/1/2011 | NJ | |
| Long Island Renal | 12/1/2011 | NY | |
| Mid Michigan Dialysis | 2/1/2012 | MI | |
| Glendale Kidney Center | Q4-12 | CA | $6,600,000 |
| Dialysis Center of Dayton | 3/1/2013 | OH | $50,324,050 |
| Great Falls Dialysis (Benefits Health System) | 12/1/2013 | MT | |
| Project Dove | 2/1/2014 | OH | $3,650,000 |
| Windsor Dialysis | 9/1/2014 | MD | |
| Deltona Dialysis | 2/1/2015 | NY | |
| Corning Dialysis | 07/1/2015 | NY | |
| Central Coast Kidney Care | 4/1/2016 | CA | $31,500,000 |
| Mt Baker Kidney Center | 6/1/2016 | WA | |

77.    DaVita has engaged in similarly fraudulent methods and schemes in dozens of joint ventures closed from February 1, 2014 until the present, i.e., in a time period not covered by

DaVita's 2014 Settlement (DaVita's CIA took effect in October 2014). These include but are not

limited to the following:

| Deal Name | Date Closed | Location |
|---|---|---|
| Hilliard Station/Heyburn | 3/1/2014 | OH |
| College Park / Woodlands II | 3/1/2014 | CO |
| Elmwood Park & North Haledon / Eufaula | 3/1/2014 | TX |
| Clinton /Colleton | 3/26/2014 | MO |
| Brunswick / Garrett | 4/1/2014 | OH |
| Moorpark / Hunter | 4/1/2014 | CA |
| East Indy / Silverwood | 4/1/2014 | IN |
| Winterhaven / Yargol | 4/1/2014 | FL |
| Round Rock | 4/1/2014 | TX |
| Calvine Home / Hyde | 4/1/2014 | CA |
| Delabar / Tyrone | 4/1/2014 | PA |
| Lourdes / Oviedo | 4/18/2014 | FL |
| Blaine / Lincolnton | 4/25/2014 | MN |
| Tazewell / Pekin | 5/1/2014 | IL |
| Westwego / Pine | 5/1/2014 | LA |
| Newton /Covington / Shone | 5/1/2014 | GA |
| Colquitt / Pedernales | 5/1/2014 | GA |
| Manasota / Magnolia | 5/1/2014 | FL |
| Hampton Roads / Zara | 5/1/2014 | VA |
| San Leandro Marina / Sapelo | 5/1/2014 | CA |
| Campbell Station / Tannor | 5/23/2014 | TN |
| Blufton / Shoals | 5/23/2014 | SC |
| Pomona Valley II / Kamiah | 6/1/2014 | CA |
| Enfield / Argyle | 6/1/2014 | CT |
| Banstanchury-Hazelton | 7/1/2014 | |
| Capital Nephrology Medical Group | 2/1/2015 | CA |
| Palomar Medical Group | 7/1/2015 | CA |
| LA County Nephrology Associates | 7/1/2015 | CA |
| Renal Medical Associates | 8/14/2015 | CA |
| Lourdes Health System | 6/1/2016 | NJ |
| Edgard M. Vera M.D. | 11/23/2016 | CA |
| Colorado Kidney Care | 12/1/2016 | CO |

| Nephrology Associates Medical Group | 12/1/2016 | CA |
| Internal Medicine Specialists New Orleans | 12/6/2016 | LA |
| Kidney Disease Medical Group | 12/15/2016 | CA |
| Nephrology Associates Medical Group | 12/15/2016 | CA |
| Wichita Nephrology Group | 1/1/2017 | KS |
| Renal Care Consultants PA | 1/13/2017 | TX |
| Nephrology PA Houston | 1/13/2017 | TX |
| Kidney Associates PLLC | 1/13/2017 | TX |
| Miami Jewish Home and Hospital for Aged | 2/1/2017 | FL |

78.    DaVita's use of form templates for its deals makes clear that all deals have the

same essential components–leases, Medical Directorships, management fees, non-competes and

restrictive covenants – that DaVita manipulates to obscure illegal physician remuneration. These

elements are manipulated to make up a non-fair-market value package of remuneration for the

selling physicians, violating the AKS and thus the FCA.

79.    For example, when an independent appraisal comes in lower than the price

desired by a selling physician, DaVita frequently increases another element of the deal to arrive

at a result satisfactory to the selling physician. In this sense, and as explained further in Relator's

mandatory disclosures to the Government, valuations are frequently reverse-engineered or

manipulated to get to a certain result. It is notable that in the case of acquisitions, DaVita

consistently manipulates its models to justify a higher sales price, not as would be the rational

business approach -- to negotiate for a lower price. This reflects the fact that the "value" of the

purchased centers is irrelevant to DaVita because these acquisitions are not designed to purchase

centers, but to disguise payments for referral streams. *It is economically preferable for DaVita*

*to pay ostensibly irrational prices for the centers themselves in order to secure the enormously*

*lucrative long-term revenue stream from referral of patients that come from these providers.*

80.     The tying together and manipulation of deal elements to maintain a total package of remuneration for physicians rather than negotiation at arms-length, violates the AKS and makes DaVita's claims to Government Health Care Programs false and fraudulent under the FCA.

## C.     Defendant Has Been and is Violating Its 2014 Corporate Integrity Agreement With the United States.

81.     In October 2014, DaVita entered into a CIA with the HHS OIG.  The CIA covers DaVita and its subsidiaries over a period of five years from October 2014 until October 2019. Many clauses in the agreement deal with compliance with the AKS.

82.     Section III.D. of the CIA titled, "Compliance with the Anti-Kickback Statute," requires DaVita to use valuation methodologies for valuing its deals that comply with the AKS. Section III.D.2.

83.     Section III.D.3. of the CIA requires DaVita to maintain a centralized tracking system for all deals and to establish and implement an approval process for existing or new arrangements to ensure that they do not violate the AKS. DaVita uses a system called Eagle to do this.

84.     Section III.D.4. of the CIA mandates that DaVita require that parties to its deals complete training in the AKS and include a written certification in the deal agreement that the parties will not violate the AKS.

85.     Section III.D of the CIA requires DaVita to ensure that its valuation methodologies for valuing deals comply with the AKS and to obtain approval of those methodologies from a Monitor appointed under the CIA to oversee its operations of its valuation methodologies. *See* CIA Section III.D; CIA Appendix C.

86.     Section III.D.4.d. of the CIA requires DaVita to submit every deal to the Monitor for a Risk Determination regarding whether the deal poses a low risk or high risk of violating the AKS.

87.     Despite the requirements of its CIA, DaVita management, including David Finn and Jeff Young, did not provide details of the manipulations alleged above to the Monitor for deals it has closed since 2014 and/or was not forthcoming about the data it provided to independent appraisers to support valuations provided to the Monitor.

88.     Suppression and omission of this information from the Monitor violates DaVita's CIA Section III.D.

89.     Suppression and omission of this information from the Monitor also demonstrates DaVita's knowledge that its deal valuation manipulations and resulting appraisals are improper.

90.     DaVita's knowledge that its conduct is improper is also demonstrated by the many false certifications that DaVita made regarding the circumstances of each deal.

91.     An integral part of the CIA and DaVita's compliance obligations is DaVita's internal Code of Conduct. CIA Section III.B.1. Pursuant to the CIA, the Code of Conduct must specify that all Covered Persons shall be expected to comply with the requirements of Federal health care programs. *Id.*

92.     The management of DaVita was aware of the CIA, the Code of Conduct, and their obligations under each. They were "Covered Persons" or "Arrangements Covered Persons" within the meaning of the CIA. *See* CIA Sections II.C.2; II.C.8. Others were, in addition, "Certifying Executives" within the meaning of the CIA. *See* CIA Section II.C.4 (defining "Certifying Executive"); Section III.A.4 (elaborating on their role). Certifying Executives

included David Finn and Jeff Young on DaVita's various acquisitions and joint ventures, while

"Arrangements Covered Persons" included the Transaction Directors.

93.    The CIA also requires, *inter alia*, that Certifying Executives sign an annual

certification of compliance. CIA Section III.A.4. The Certifying Executives' certification states,

*inter alia*, that:

> I have been trained on and understand the compliance requirements and
> responsibilities as they relate to [functional area], an area under my
> supervision…Apart from those [issues I have referred internally as potential
> violations]…I am not currently aware of any violations of applicable Federal
> health care program laws and regulations, obligations of the Corporate Integrity
> Agreement, or the requirements of the policies of DaVita HealthCare Partners. I
> understand that this certification is being provided to and relied upon by the
> United States.

CIA Section III.A.4.

94.    Under CIA Section III.B, the policies of DaVita must address:

    a.    42 U.S.C. 1320a-7b(b) (Anti-Kickback Statute) and the regulations
and other guidance documents related to that statute, and business or
financial relationships or contracts that generate unlawful Federal
health care program business in violation of the Anti-Kickback
Statute; and

    b.    the requirements set forth in Section III.D (Compliance with the Anti-
Kickback Statute).

CIA Section II.B.2.

95.    The CIA also provides that if DaVita determines there has been an event that "a

reasonable person would consider a probable violation of criminal, civil or administrative laws

applicable to any Federal health care program for which penalties or exclusion may be

authorized," DaVita must report that event to the OIG. CIA Section III.P.

96.    Section V.C. of the CIA requires DaVita to submit Annual Reports to the OIG of

DaVita's compliance activities. This must include the certifications of the Certifying Executives.

97.     Pursuant to the CIA, Section V.D.2, the Annual Report must also include

certifications by the Compliance Officer and Chief Executive Officers as follows:

    a.    **to the best of his or her knowledge, except as otherwise described in the report, DaVita is in compliance with all of the requirements of this CIA;**

    b.    **to the best of his or her knowledge, DaVita has implemented procedures reasonably designed to ensure that all Focus Arrangements do not violate the Anti-Kickback Statute, including the Focus Arrangements Procedures required in Section III.D of the CIA;**

    c.    **to the best of his or her knowledge, DaVita has fulfilled the requirements for new and renewed Focus Arrangements under Section III.D.4 of the CIA; and**

    d.    **he or she has reviewed the report and has made reasonable inquiry regarding its content and believes that the information in the report is accurate and truthful.**

98.     DaVita's Compliance Officer was aware of the CIA and was the person who

signed and attested to the truthfulness of the required annual certifications.

99.     Certifications signed by the Compliance Officer and other "Covered Persons,"

"Arrangements Covered Persons" and "Certifying Executives" from October 2014 onwards were

materially false or fraudulent in that DaVita repeatedly certified that it complied with the

obligations and reporting requirements under the CIA and applicable laws including the AKS

when in fact it did not comply and did not report the violations of the AKS and FCA alleged in

this Complaint.

100.    Since October 2014, DaVita has submitted one or more false certifications to the

OIG falsely attesting that it and its subsidiaries were in compliance with all of the requirements

of the CIA, including the requirement of AKS compliance. Such false certifications constituted

false records or statements made, used, or caused to be used which were material to DaVita's

obligation to pay or transmit money to the United States. Further, through such false

certifications, Company knowingly concealed and/or improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

101.    DaVita's compliance with its CIA is a contractual precondition of DaVita's participation in and reimbursement under Medicaid and Medicare. As such, violations of the CIA make DaVita's payment claims in the period covered by the CIA false or fraudulent under the FCA.

**D.    Harm to the Government: Damages and Penalties**

102.    The direct financial loss and harm caused to Government Health Care Programs by DaVita's improper and illegal conduct in closing multi-million dollar deals to remunerate physicians based on manipulated and fraudulent valuations and other illegal remuneration is substantial. The revenue stream from tainted patient referrals stretches over many, many years and amounts to hundreds of millions of dollars (by summing up the amounts of DaVita's deals, which are valued according to DaVita's expected revenue).

103.    There are also several indirect and intangible harms, all of the type the AKS sought to curtail. As a general matter, inducement of physicians to refer undermines free competition and raises the prices that the government must pay for health care services. Physician inducement undermines patient autonomy and choice and the quality and value of the care patients receive. Not only are Government Health Care Programs paying more for these services than they otherwise would, the quality of care is impacted.

104.    Furthermore, DaVita's conduct in proceeding with manipulations similar to those that it was already sanctioned for in 2014 makes a mockery of the CIA and Independent Monitor procedures and so undermines the efficacy of government enforcement and oversight of fraud on Government Health Care Programs.

## VI.   CLAIMS FOR RELIEF

### Count I

### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A) (2009)

105.   Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

106.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

107.   By and through the acts described above, Defendant has knowingly presented or caused to be presented false or fraudulent claims for payment or approval.

108.   The Government, unaware of the falsity of all such claims made or caused to be made by Defendant, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendant's illegal conduct.

109.   By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

110.   Additionally, the United States is entitled to the maximum statutory penalty for each and every violation alleged herein.

### Count II

### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(B) (2009)

111.   Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

112.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

113.    By and through the acts described above, Defendant knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

114.    The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendant, has paid and continues to pay claims that would not be paid but for Defendant's illegal conduct.

115.    By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

116.    Additionally, the United States is entitled to the maximum statutory penalty for each and every violation alleged herein.

## Count III

### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(G) (2009)

117.    Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

118.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

119.    By and through the acts described above, Defendant has knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay money to the Government and it has concealed and improperly avoided an obligation to pay money to the Government, including specifically Defendant's obligation to report and repay past overpayments of Medicare and other Government Health Care Program claims for which Defendant knew it was not entitled to be paid and therefore refunds were properly due and owing to the United States.

120.    The Government, unaware of the concealment by the Defendant, has not made demand for or collected the years of overpayments due from the Defendant.

121.    By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

122.    Additionally, the United States is entitled to the maximum statutory penalty for each and every violation alleged herein.

## Count IV

### California False Claims Act,
### Cal. Gov't Code §§ 12650, *et seq.*

123.    Relator incorporates by reference the preceding paragraphs as though fully set forth herein.

124.    This is a civil action brought by Relator, on behalf of the State of California, against DaVita under the California False Claims Act, Cal. Gov. Code § 12652(c).

125.    The California FCA, Cal. Gov. Code § 12651(a)(1), creates liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval." DaVita has violated this provision of the California FCA.

126.    The California FCA, Cal. Gov. Code § 12651(a)(2), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." DaVita has violated this provision of the California FCA.

127.    The California FCA, Cal. Gov. Code § 12651(a)(7), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an

obligation to pay or transmit money or property to the state or to any political subdivision."

DaVita has violated this provision of the California FCA.

128.    Pursuant to the California FCA, DaVita is thus liable to the State for statutorily

defined damages sustained because of the acts of DaVita and civil penalties. Cal. Gov't. Code §

12651(a).

**Count V**

**Colorado Medicaid False Claims Act,**
**Colo. Rev. Stat. §§ 25.5-4-303.5, *et seq.***

129.    Relator incorporates by reference the preceding paragraphs as though fully set

forth herein.

130.    This is a civil action brought by Relator, in the name of the State of Colorado,

against DaVita pursuant to the State of Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§

25.5-4-306 *et seq.*.

131.    The Colorado FCA, Colo. Rev. Stat. § 25.5-4- 305(1)(a), creates liability for any

person who "[k]nowingly presents, or causes to be presented, to an officer or employee of the

state a false or fraudulent claim for payment or approval." DaVita has violated this provision of

the Colorado FCA.

132.    The Colorado FCA, Colo. Rev. Stat. § 25.5-4- 305(1)(b), creates liability for any

person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement

material to a false or fraudulent claim." DaVita has violated this provision of the Colorado FCA.

133.    The Colorado FCA, Colo. Rev. Stat. § 25.5-4- 305(1)(f), creates liability for any

person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement

material to an obligation to pay or transmit money or property to the state in connection with the

'Colorado Medical Assistance Act', or knowingly conceals or knowingly and improperly avoids

-38-

or decreases an obligation to pay or transmit money or property to the state in connection with the 'Colorado Medical Assistance Act'." DaVita has violated this provision of the Colorado FCA.

134.    Pursuant to the Colorado FCA, DaVita is thus liable to the State for statutorily defined damages sustained because of the acts of DaVita and civil penalties. Colo. Rev. Stat. § 25.5-4- 305(1).

<h3 align="center">Count VI</h3>

<h3 align="center">Connecticut False Claims Act, Conn. Gen. Stat. §§ 4-274, <em>et seq.</em></h3>

135.    Relator incorporates by reference the preceding paragraphs as though fully set forth herein.

136.    This is a civil action brought by Relator, in the name of the State of Connecticut, against DaVita pursuant to the State of Connecticut False Claims Act, Conn. Gen. Stat. § 4-277.

137.    The Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(1), provides that no person shall "[k]nowingly present, or cause to be presented, a false or fraudulent claim for payment or approval under a state-administered health or human services program." DaVita has violated this provision of the Connecticut FCA.

138.    The Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(2), provides that no person shall "[k]nowingly make, use or cause to be made or used, a false record or statement material to a false or fraudulent claim under a state-administered health or human services program." DaVita has violated this provision of the Connecticut FCA.

139.    The Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(7), provides that no person shall "[k]nowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state under a state-administered health or human services program." DaVita has violated this provision of the Connecticut FCA.

-39-

140.    The Connecticut FCA, Conn. Gen. Stat. § 4-275(a)(8), provides that no person shall "[k]nowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the state under a state-administered health or human services program." DaVita has violated this provision of the Connecticut FCA.

141.    Pursuant to the Connecticut FCA, DaVita is thus liable to the State for statutorily defined damages sustained because of the acts of DaVita and civil penalties. Conn. Gen. Stat. § 4-275(b).

## Count VII

### Florida False Claims Act,
### Fla. Stat. §§ 68.081, *et seq.*

142.    Relator incorporates by reference the preceding paragraphs as though fully set forth herein.

143.    This is a civil action brought by Relator, on behalf of the State of Florida, against DaVita under the State of Florida's False Claims Act, Fla. Stat. § 68.083(2).

144.    The Florida FCA, Fla. Stat. § 68.082(2)(a), creates liability for any person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval." DaVita has violated this provision of the Florida FCA.

145.    The Florida FCA, Fla. Stat. § 68.082(2)(b), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." DaVita has violated this provision of the Florida FCA.

146.    The Florida FCA, Fla. Stat. § 68.082(2)(g), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly

and improperly avoids or decreases an obligation to pay or transmit money or property to the state." DaVita has violated this provision of the Florida FCA.

147.    Pursuant to the Florida FCA, DaVita is thus liable to the State for statutorily defined damages sustained because of the acts of DaVita and civil penalties. Fla. Stat. § 68.082(2).

<h3 style="text-align:center"><u>Count VIII</u></h3>

<b>Georgia False Medicaid Claims Act,<br>Ga. Code Ann. §§ 49-4-168, <i>et seq.</i></b>

148.    Relator incorporates by reference the preceding paragraphs as though fully set forth herein.

149.    This is a civil action brought by Relator, in the name of the State of Georgia, against DaVita pursuant to the State of Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.2(b).

150.    The Georgia FCA, Ga. Code Ann. § 49-4-168.1(a)(1), creates liability for any person who "[k]nowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval." DaVita has violated this provision of the Georgia FCA.

151.    The Georgia FCA, Ga. Code Ann. § 49-4-168.1(a)(2), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." DaVita has violated this provision of the Georgia FCA.

152.    The Georgia FCA, Ga. Code Ann. § 49-4-168.1(a)(7), creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or

-41-

transmit property or money to the Georgia Medicaid program." DaVita has violated this provision of the Georgia FCA.

153.    Pursuant to the Georgia FCA, DaVita is thus liable to the State for statutorily defined damages sustained because of the acts of DaVita and civil penalties. Ga. Code Ann. § 49-4-168.1(a).

<b>Count IX</b>

<b>Illinois False Claims Act,<br>740 Ill. Comp. Stat. §§ 175/1, <i>et seq.</i></b>

154.    Relator incorporates by reference the preceding paragraphs as though fully set forth herein.

155.    This is a civil action brought by Relator, on behalf of the State of Illinois, against DaVita under the Illinois False Claims Act, 740 Ill. Comp. Stat. § 175/4(b).

156.    The Illinois FCA, 740 Ill. Comp. Stat. § 175/3(a)(1)(A), creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." DaVita has violated this provision of the Illinois FCA.

157.    The Illinois FCA, 740 Ill. Comp. Stat. § 175/3(a)(1)(B), creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." DaVita has violated this provision of the Illinois FCA.

158.    The Illinois FCA, 740 Ill. Comp. Stat. § 175/3(a)(1)(G), creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State." DaVita has violated this provision of the Illinois FCA.

159.    Pursuant to the Illinois FCA, DaVita is thus liable to the State for statutorily defined damages sustained because of the acts of DaVita and civil penalties. 740 Ill. Comp. Stat. § 175/3(a).

**Count X**

**Indiana Medicaid False Claims and Whistleblower Protection Act,
Ind. Code §§ 5-11-5.7, *et seq.***

160.    Relator incorporates by reference the preceding paragraphs as though fully set forth herein.

161.    This is a civil action brought by Relator, on behalf of the State of Indiana, against DaVita under the State of Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.7-4(a).

162.    The Indiana FCA, Ind. Code § 5-11-5.7-2(a)(l), creates liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." DaVita has violated this provision of the Indiana FCA.

163.    The Indiana FCA, Ind. Code § 5-11-5.7-2(a)(2), creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim." DaVita has violated this provision of the Indiana FCA.

164.    The Indiana FCA, Ind. Code § 5-11-5.7-2(a)(6)(A)-(B), creates liability for any person who "(A) makes, uses, or causes to be made or used, a false record or statement concerning an obligation to pay or transmit money or property to the state; or (B) conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state." DaVita has violated this provision of the Indiana FCA.

-43-

165.    Pursuant to the Indiana FCA, DaVita is thus liable to the State for statutorily defined damages sustained because of the acts of DaVita and civil penalties. Ind. Code § 5-11-5.5-2(b).

## Count XI

### Iowa False Claims Act,
### Iowa Code §§ 685.1, *et seq.*

166.    Relator incorporates by reference the preceding paragraphs as though fully set forth herein.

167.    This is a civil action brought by Relator, on behalf of the State of Iowa, against DaVita under the State of Iowa False Claims Act, Iowa Code § 685.3(2).a.

168.    The Iowa FCA, Iowa Code § 685.2(1).a, creates liability for any person who "[k]nowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." DaVita has violated this provision of the Iowa FCA.

169.    The Iowa FCA, Iowa Code § 685.2(1).b, creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." DaVita has violated this provision of the Iowa FCA.

170.    The Iowa FCA, Iowa Code § 685.2(1).g, creates liability for any person who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state." DaVita has violated this provision of the Iowa FCA.

171.    Pursuant to the Iowa FCA, DaVita is thus liable to the State for statutorily defined damages sustained because of the acts of DaVita and civil penalties. Iowa Code § 685.2(1).

## Count XII

### Louisiana Medical Assistance Programs Integrity Law,
### La. Rev. Stat. Ann. §§ 46:437.1, *et seq.*

172.    Relator incorporates by reference the preceding paragraphs as though fully set forth herein.

173.    This is a civil action brought by Relator, on behalf of the State of Louisiana's medical assistance programs, against DaVita under the State of Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1.A.

174.    The Louisiana FCA, La. Rev. Stat. Ann. § 46:438.3.A, provides that "[n]o person shall knowingly present or cause to be presented a false or fraudulent claim." DaVita has violated this provision of the Louisiana FCA.

175.    The Louisiana FCA, La. Rev. Stat. Ann. § 46:438.3.B, provides that "[n]o person shall knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim." DaVita has violated this provision of the Louisiana FCA.

176.    The Louisiana FCA, La. Rev. Stat. Ann. § 46:438.3.C, provides that "[n]o person shall knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs." DaVita has violated this provision of the Louisiana FCA.

177.    Pursuant to the Louisiana FCA, DaVita is thus liable to the State for statutorily defined damages sustained because of the acts of DaVita and civil penalties. La. Rev. Stat. Ann. § 46:438.6.

-45-

## Count XIII

### Maryland False Health Claims Act,
### Md. Code Ann. Health-Gen. §§ 2-601, *et seq.*

178.    Relator incorporates by reference the preceding paragraphs as though fully set forth herein.

179.    This is a civil action brought by Relator, on behalf of the State of Maryland, against DaVita under the State of Maryland False Health Claims Act, Md. Code Ann. Health-Gen. § 2-604(a)(1):

180.    The Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(1), provides that a person may not "[k]nowingly present or cause to be presented a false or fraudulent claim for payment or approval." DaVita has violated this provision of the Maryland FCA.

181.    The Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(2), provides that a person may not "[k]nowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim." DaVita has violated this provision of the Maryland FCA.

182.    The Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(7), provides that a person may not "[k]nowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or other property to the State." DaVita has violated this provision of the Maryland FCA.

183.    The Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(8), provides that a person may not "[k]nowingly conceal, or knowingly and improperly avoid or decrease, an obligation to pay or transmit money or other property to the State." DaVita has violated this provision of the Maryland FCA.

184.    The Maryland FCA, Md. Code Ann. Health-Gen. § 2-602(a)(9), provides that a person may not "[k]nowingly make any other false or fraudulent claim against a State health plan or a State health program." DaVita has violated this provision of the Maryland FCA.

185.    Pursuant to the Maryland FCA, DaVita is thus liable to the State for statutorily defined damages sustained because of the acts of DaVita and civil penalties. Md. Code Ann. Health-Gen. § 2-602(b).

## Count XIV

### Michigan Medicaid False Claims Act,
### Mich. Comp. Laws Serv. §§ 400.601, *et seq.*

186.    Relator incorporates by reference the preceding paragraphs as though fully set forth herein.

187.    This is a civil action brought by Relator, in the name of the State of Michigan, against DaVita under the State of Michigan Medicaid False Claims Act, Mich. Comp. Laws Serv. § 400.610a(l).

188.    The Michigan FCA, Mich. Comp. Laws. Serv. § 400.603(1)-(3), provides that:

(1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for medicaid benefits.

(2) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a medicaid benefit.

(3) A person, who having knowledge of the occurrence of an event affecting his initial or continued right to receive a medicaid benefit or the initial or continued right of any other person on whose behalf he has applied for or is receiving a benefit, shall not conceal or fail to disclose that event with intent to obtain a benefit to which the person or any other person is not entitled or in an amount greater than that to which the person or any other person is entitled.

DaVita has violated each of these provisions of the Michigan FCA.

189.    The Michigan FCA, Mich. Comp. Laws. Serv. § 400.607(1), provides that "[a] person shall not make or present or cause to be made or presented to an employee or officer of this state a claim under the social welfare act, 1939 PA 280, MCL 400.1 to 400.119b, upon or against the state, knowing the claim to be false." DaVita has violated this provision of the Michigan FCA.

190.    The Michigan FCA, Mich. Comp. Laws. Serv. § 400.607(3), provides that "[a] person shall not knowingly make, use, or cause to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state pertaining to a claim presented under the social welfare act." DaVita has violated this provision of the Michigan FCA.

191.    Pursuant to the Michigan FCA, DaVita is thus liable to the State for statutorily defined damages sustained because of the acts of DaVita and civil penalties. Mich. Comp. Laws. Serv. § 400.612.

### Count XV

### Minnesota False Claims Act,
### Minn. Stat. §§ 15C.01, *et seq.*

192.    Relator incorporates by reference the preceding paragraphs as though fully set forth herein.

193.    This is a civil action brought by Relator, on behalf of the State of Minnesota and its political subdivisions, against DaVita under the State of Minnesota False Claims Act, Minn. Stat. § 15C.05(a).

194.    The Minnesota FCA, Minn. Stat. § 15C.02(a), creates liability for any person who, *inter alia*:

> **(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;**

(2) knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

... or

(7) knowingly makes or uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a political subdivision, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a political subdivision.

DaVita has violated these provisions of the Minnesota FCA.

195.    Pursuant to the Minnesota FCA, DaVita is thus liable to the State for statutorily defined damages sustained because of the acts of DaVita and civil penalties. Minn. Stat. § 15C.02(a).

## Count XVI

### Montana False Claims Act,
### Mont. Code Ann. §§ 17-8-401, *et seq.*

196.    Relator incorporates by reference the preceding paragraphs as though fully set forth herein.

197.    This is a civil action brought by Relator, on behalf of the State of Montana, against DaVita under the State of Montana False Claims Act, Mont. Code Ann. § 17- 8-406(1).

198.    The Montana FCA, Mont. Code Ann. § 17- 8-403(1), creates liability for any person who, *inter alia*:

 (a) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

...

(g) knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to a

governmental entity or knowingly conceals or knowingly and improperly avoids
or decreases an obligation to pay or transmit money or property to a governmental
entity.

DaVita has violated each of these provisions of the Montana FCA.

199.    Pursuant to the Montana FCA, DaVita is thus liable to the State for statutorily

defined damages sustained because of the acts of DaVita and civil penalties. Mont. Code Ann. §

17- 8-403(2).

## Count XVII

### Nevada Submission of False Claims to State or Local Government Act,
### Nev. Rev. Stat. §§ 357.010, *et seq.*

200.    Relator incorporates by reference the preceding paragraphs as though fully set

forth herein.

201.    This is a civil action brought by Relator, on behalf of the State of Nevada, against

DaVita under the State of Nevada Submission of False Claims to State or Local Government

Act, Nev. Rev. Stat. § 357.080(1).

202.    The Nevada FCA, Nev. Rev. Stat. § 357.040(l), creates liability for any person

who, *inter alia*:

(a) Knowingly presents or causes to be presented a false or fraudulent claim for
payment or approval.

(b) Knowingly makes or uses, or causes to be made or used, a false record or
statement that is material to a false or fraudulent claim.

...

(f) Knowingly makes or uses, or causes to be made or used, a false record or
statement that is material to an obligation to pay or transmit money or property to
the State or a political subdivision.

(g) Knowingly conceals or knowingly and improperly avoids or decreases an
obligation to pay or transmit money or property to the State or a political
subdivision.

DaVita has violated each of these provisions of the Nevada FCA.

203.    Pursuant to the Nevada FCA, DaVita is thus liable to the State for statutorily

defined damages sustained because of the acts of DaVita and civil penalties. Nev. Rev. Stat. §

357.040(2).

## Count XVIII

### New Jersey False Claims Act,
### N.J. Stat. Ann. §§ 2A:32C-1, *et seq.*

204.    Relator incorporates by reference the preceding paragraphs as though fully set

forth herein.

205.    This is a civil action brought by Relator, in the name of the State of New Jersey,

against DaVita pursuant to the State of New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-

5.b.

206.    The New Jersey FCA, N.J. Stat. Ann. § 2A:32C-3, creates liability for any person

who, *inter alia*:

a. Knowingly presents or causes to be presented to an employee, officer or agent
of the State, or to any contractor, grantee, or other recipient of State funds, a false
or fraudulent claim for payment or approval;

b. Knowingly makes, uses, or causes to be made or used a false record or
statement to get a false or fraudulent claim paid or approved by the State;

... or

g. Knowingly makes, uses, or causes to be made or used a false record or
statement to conceal, avoid, or decrease an obligation to pay or transmit money or
property to the State.

DaVita has violated each of these provisions of the New Jersey FCA.

207.    Pursuant to the New Jersey FCA, DaVita is thus liable to the State for statutorily

defined damages sustained because of the acts of DaVita and civil penalties. N.J. Stat. Ann. §

2A:32C-3.

## Count XIX

### New York False Claims Act,
### N.Y. State Fin. Law §§ 187, *et seq.*

208.    Relator incorporates by reference the preceding paragraphs as though fully set

forth herein.

209.    This is a civil action brought by Relator, on behalf of the State of New York,

against DaVita under the State of New York False Claims Act, N.Y. State Fin. Law § 190(2).

210.    The New York FCA, N.Y. State Fin. Law § 189(1), creates liability for any

person who, *inter alia*:

(a) knowingly presents, or causes to be presented a false or fraudulent claim for
payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or
statement material to a false or fraudulent claim;

...

(g) knowingly makes, uses, or causes to be made or used, a false record or
statement material to an obligation to pay or transmit money or property to the
state or a local government; or

(h) knowingly conceals or knowingly and improperly avoids or decreases an
obligation to pay or transmit money or property to the state or a local
government[.]

DaVita has violated each of these provisions of the New York FCA.

211.    Pursuant to the New York FCA, DaVita is thus liable to the State for statutorily

defined damages sustained because of the acts of DaVita and civil penalties. N.Y. State Fin. Law

§ 189(1).

## Count XX

### North Carolina False Claims Act,
### N.C. Gen. Stat. §§ 1-605, *et seq.*

212.    Relator incorporates by reference the preceding paragraphs as though fully set

forth herein.

213.    This is a civil action brought by Relator, on behalf of the State of North Carolina,

against DaVita under the State of North Carolina False Claims Act, N.C. Gen. Stat. § 1-608(b).

214.    The North Carolina FCA, N.C. Gen. Stat. § 1-607(a), creates liability for any

person who, *inter alia*:

**(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.**

**(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim...**

**(7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.**

DaVita has violated each of these provisions of the North Carolina FCA.

215.    Pursuant to the North Carolina FCA, DaVita is thus liable to the State for

statutorily defined damages sustained because of the acts of DaVita and civil penalties. N.C.

Gen. Stat. § 1-607(a).

## Count XXI

### Oklahoma Medicaid False Claims Act,
### Okla. Stat. tit. 63, §§ 5053, *et seq.*

216.    Relator incorporates by reference the preceding paragraphs as though fully set

forth herein.

217. This is a civil action brought by Relator, in the name of the State of Oklahoma,

against DaVita pursuant to the State of Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63,

§ 5053.2(B).

218. The Oklahoma FCA, Okla. Stat. tit. 63, § 5053.1(B), creates liability for any

person who, *inter alia*:

**1. Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;**

**2. Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;... or**

**7. Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state.**

DaVita has violated each of these provisions of the Oklahoma FCA.

219. Pursuant to the Oklahoma FCA, DaVita is thus liable to the State for statutorily

defined damages sustained because of the acts of DaVita and civil penalties. Okla. Stat. tit. 63, §

5053.1(B).

## Count XXII

### Tennessee Medicaid False Claims Act,
### Tenn. Code Ann. §§ 71-5-181, *et seq.*

220. Relator incorporates by reference the preceding paragraphs as though fully set

forth herein.

221. This is a civil action brought by Relator, in the name of the State of Tennessee,

against DaVita under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-

183(b)(1) ("Tennessee FCA").

-54-

222.   The Tennessee FCA, Tenn. Code Ann. § 71-5-182(a)(l), creates liability for any

person who, *inter alia*:

(A) Knowingly presents, or causes to be presented, a false or fraudulent claim for
payment or approval under the medicaid program;

(B) Knowingly makes, uses, or causes to be made or used, a false record or
statement material to a false or fraudulent claim under the medicaid program; ...
or

(D) Knowingly makes, uses, or causes to be made or used, a false record or
statement material to an obligation to pay or transmit money, or property to the
state, or knowingly conceals, or knowingly and improperly, avoids, or decreases
an obligation to pay or transmit money or property to the state, relative to the
medicaid program.

DaVita has violated each of these provisions of the Tennessee FCA.

223.   Pursuant to the Tennessee FCA, DaVita is thus liable to the State for statutorily

defined damages sustained because of the acts of DaVita and civil penalties. Tenn. Code Ann. §

71-5-182(a).

## Count XXIII

### Texas Medicaid Fraud Prevention Act,
### Tex. Hum. Res. Code §§ 36.001, *et seq.*

224.   Relator incorporates by reference the preceding paragraphs as though fully set

forth herein.

225.   This is a civil action brought by Relator, in the name of the State of Texas, against

DaVita under the State of Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §

36.101(a).

226.   The Texas FCA, Tex. Hum. Res. Code § 36.002, creates liability for any person

who, *inter alia*:

(1) knowingly makes or causes to be made a false statement or misrepresentation
of a material fact to permit a person to receive a benefit or payment under the

Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(3) knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received ...

(5) except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

(12) knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program; or

(13) knowingly engages in conduct that constitutes a violation under Section 32.039(b) [where 32.039(b)(1-b) says that a person commits a violation if the person "solicits or receives, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind for referring an individual to a person for the furnishing of, or for arranging the furnishing of, any item or service for which payment may be made, in whole or in part, under the medical assistance program, provided that this subdivision does not prohibit the referral of a patient to another practitioner within a multispecialty group or university medical services research and development plan (practice plan) for medically necessary services"].

DaVita has violated each of these provisions of the Texas FCA.

227.    Pursuant to the Texas FCA, DaVita is thus liable to the State for statutorily

defined damages sustained because of the acts of DaVita and civil penalties. Tex. Hum. Res.

Code § 36.052.

## Count XXIV

### Commonwealth Of Virginia Fraud Against Taxpayers Act,
### Va. Code Ann. §§ 8.01-216.1, *et seq.*

228.    Relator incorporates by reference the preceding paragraphs as though fully set

forth herein.

229.    This is a civil action brought by Relator, on behalf of the Commonwealth of

Virginia, against DaVita under the Commonwealth of Virginia Fraud Against Taxpayers Act,

Va. Code Ann. § 8.01-216.5(A).

230.    The Virginia FCA, Va. Code Ann. § 8.01-216.3(A), creates liability for any

person who, *inter alia*:

> 1. Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> 2. Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> … or
>
> 7. Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Commonwealth or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Commonwealth.

DaVita has violated each of these provisions of the Virginia FCA.

231.    Pursuant to the Virginia FCA, DaVita is thus liable to the State for statutorily

defined damages sustained because of the acts of DaVita and civil penalties. Va. Code Ann.

§ 8.01-216.3(A).

-57-

## Count XXV

### Washington State Medicaid Fraud False Claims Act,
### Wash. Rev. Code §§ 74.66.005, *et seq.*

232.    Relator incorporates by reference the preceding paragraphs as though fully set

forth herein.

233.    This is a civil action brought by Relator, on behalf of the State of Washington,

against DaVita under the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code

§ 74.66.050(1).

234.    The Washington FCA, Wash. Rev. Code § 74.66.020(1), creates liability for any

person who, *inter alia*:

(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for
payment or approval;

(b) Knowingly makes, uses, or causes to be made or used, a false record or
statement material to a false or fraudulent claim;

...or

(g) Knowingly makes, uses, or causes to be made or used, a false record or
statement material to an obligation to pay or transmit money or property to the
government entity, or knowingly conceals or knowingly and improperly avoids or
decreases an obligation to pay or transmit money or property to the government
entity.

DaVita has violated each of these provisions of the Washington FCA.

235.    Pursuant to the Washington FCA, DaVita is thus liable to the State for statutorily

defined damages sustained because of the acts of DaVita and civil penalties. Wash. Rev. Code

§ 74.66.020(1).

## Count XXVI

### Wisconsin False Claims For Medical Assistance Act,
### Wis. Stat. §§ 20.931, et seq.

236.    Relator incorporates by reference the preceding paragraphs as though fully set

forth herein.

237.    This is a civil action brought by Relator, on behalf of the State of Wisconsin,

against DaVita under the State of Wisconsin False Claims for Medical Assistance Act, Wis. Stat.

§ 20.931(5)(a), for acts occurring prior to the non-retroactive repeal of that law effective July 14,

2015.

238.    The Wisconsin FCA, Wis. Stat. § 20.931(2), creates liability for any person who,

*inter alia*:

   (a) Knowingly presents or causes to be presented to any officer, employee, or
   agent of this state a false claim for medical assistance.

   (b) Knowingly makes, uses, or causes to be made or used a false record or
   statement to obtain approval or payment of a false claim for medical assistance.

   ....

   (g) Knowingly makes, uses, or causes to be made or used a false record or
   statement to conceal, avoid, or decrease any obligation to pay or transmit money
   or property to the Medical Assistance program.

DaVita has violated each of these provisions of the Wisconsin FCA, with respect to conduct and

claims prior to July 14, 2015.

239.    Pursuant to the Wisconsin FCA, DaVita is thus liable to the State for statutorily

defined damages sustained because of the acts of DaVita and civil penalties. Wis. Stat.

§ 20.931(2).

## VII.    PRAYERS FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendant as follows:

A.        That Defendant is enjoined from violating the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* and the State FCAs;

B.        That judgment be entered against Defendant and in favor of the United States and the Relator in an amount equal to three times the amount of damages caused by Defendant's misconduct, as well as a civil penalty for each FCA violation in the maximum statutory amount;

C.        That judgment be entered against Defendant and in favor of the *Qui Tam* States and the Relator in the amount of the damages sustained by the *Qui Tam* States multiplied as provided for in the State FCAs, plus the maximum civil penalties provided by the State FCAs;

D.        That Defendant be ordered to disgorge all sums by which it has been enriched unjustly by its wrongful conduct;

E.        That judgment be granted for Relator against Defendant for all costs, including, but not limited to, court costs, litigation costs, expert fees, and all attorneys' fees permitted under 31 U.S.C. § 3730(d), and comparable provisions of the State FCAs;

F.        That Relator be awarded the maximum amount permitted under 31 U.S.C. § 3730(d), and comparable provisions of the State FCAs; and

G.        That the Court award such other relief as the Court deems proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff-Relator requests a jury trial.

Dated: March 24, 2017

Respectfully submitted,

CARTUSCIELLO & KOZACHEK LLC

By: /s/ Neil S. Cartusciello
        Neil S. Cartusciello (NSC-2460)
        101 Farnsworth Avenue
        Bordentown, NJ 08505
        (609) 324-8200
        Fax: (609) 324-8201
        Email: n.cartusciello@verizon.net

Robert M. Thomas, Jr. (Mass. BBO #645600)
THOMAS & ASSOCIATES
20 Park Plaza, Suite 438
Boston, MA 02116-4322
(617) 371-0934
bob@thomasdurrell.com

Suzanne E. Durrell (Mass. BBO #139280)
DURRELL LAW OFFICE
180 Williams Avenue
Milton, Massachusetts 02186
(617) 333-9681
suzanne@thomasdurrell.com

David W. S. Lieberman (Mass. BBO #673803)
POWDERHOUSE LAW, LLC
24 Powder House Terrace, #1
Somerville, MA 02144
(617) 804-6401
david@thomasdurrell.com